**1340**

Jerome SILO

v.

COMMISSIONER OF PENNSYLVANIA
BUREAU OF CORRECTION and
Ernest S. Patton, Supt.

Civ. No. 73–447.

United States District Court,
M. D. Pennsylvania.

April 4, 1974.

Jerome Silo, pro se.

Israel Packel, Atty. Gen., Marc Kapustin, Deputy Atty. Gen., Harrisburg, Pa., for defendant.

## MEMORANDUM AND ORDER

NEALON, District Judge.

In this civil rights action, the sole question to be decided at this time is whether plaintiff Jerome Silo, an inmate in the State Correctional Institution at Camp Hill, is constitutionally entitled to have the Commonwealth of Pennsylvania provide him with legal counsel, subject to his approval or rejection. The thrust of plaintiff's theory is that since the Camp Hill facility purportedly does not have an adequate legal library, he is not only entitled to have the state retain counsel for him in order to assist him in seeking redress of his grievances, Gilmore v. Lynch, 319 F.Supp. 105 (N.D.Calif.1970), aff'd. sub nom. Younger v. Gilmore, 404 U.S. 15, 92 S.Ct. 250, 30 L.Ed.2d 142 (1970); Hooks v. Wainwright, 352 F. Supp. 163 (M.D.Fla.1972), but that he must also be free to reject counsel provided by the state. Plaintiff further insists that the counsel he selects must be paid on a fee basis by the state.

An evidentiary hearing was held before this Court on December 6, 1973, in order to explore the legal and factual underpinnings of plaintiff's theory. For the reasons stated below, I now conclude that plaintiff is not entitled to have the state provide him with counsel under the conditions specified by him. At that hearing, the Court also sought to determine whether there was any basis underlying an avalanche of allegations filed by plaintiff in which he complained, among other things, that he was being subjected to cruel and unusual punishment and that he was being pinpointed for execution. Over a host of objections, the Court repeatedly requested plaintiff to produce whatever evidence he had to support his application for a temporary restraining order. Plaintiff called one witness, James Ballard Hakanson, but his testimony fell far short of supporting plaintiff's claims of abuse and maltreatment. Accordingly, the application for a temporary restraining order was denied.

Because of the nature of this case, I deem it appropriate to trace plaintiff's motion for the appointment of counsel from its inception to the December 6th hearing.

On July 27, 1973, plaintiff filed an 18-page hand-written complaint containing 36 separate paragraphs in the United States District Court for the Eastern District of Pennsylvania. By order of that Court, dated August 10, 1973, the record was transferred to this District where venue was properly laid. After construing the complaint upon receipt,

this Court dismissed certain allegations insofar as they set forth a claim for relief by way of habeas corpus since plaintiff had not exhausted his available state remedies and allowed him to proceed *in forma pauperis* with respect to the alleged violations of his civil rights. Among other things, plaintiff complained that his funds were not transferred with him from the Philadelphia Detention Center to Camp Hill; that he requested, but was denied, certain law books at Camp Hill; that he was subjected to cruel and unusual punishment and discriminatory treatment; that he was deprived of adequate medical care; that he was compelled to speak with a psychologist in violation of his rights to due process of law; and that the state refused to arrange for the distribution of 50 newspapers per day to the inmates at Camp Hill. Because of the jumbled nature of the complaint, plaintiff was directed to specify in an orderly fashion the particular facts upon which he based his claim for relief under the Civil Rights Act, 42 U.S.C. § 1983.

On August 22, 1973, plaintiff filed his first motion to compel the state to provide him with counsel. (Document 4) By order of September 4, 1973, plaintiff's motion was denied (D 7), but upon reconsideration, this Court, by order of September 20, 1973, directed the parties to brief the issue. (D 13). On October 13, 1973, plaintiff, in his second motion for the appointment of counsel, stated that "Silo wants the record to unmistakeably show that he unequivocally wishes to set this precedent in this instant case and wishes to alert Judge Nealon to the fact that his honor has denied motion to 'appoint'." (D 18) In that motion, plaintiff further suggested that the Court should establish guidelines in order to preclude the possibility of a conflict of interest in having the state select an attorney for him.

On November 3, 1973, at the request of the Pennsylvania Deputy Attorney General, Marc Kapustin, Esq., Atty. Isaac Pepp, Assistant Defender, Defender Association of Philadelphia, attempted to interview plaintiff at Camp Hill but Silo refused to speak with him. (D 32) By letter dated November 5, 1973, (attached to D 31), plaintiff informed the Court that he had previously spoken with Mr. Pepp on July 20, 1970, at which time he formed the opinion that he would not trust Mr. Pepp to challenge the constitutionality of the Pennsylvania Mental Health Act. Plaintiff also emphasized that he "needs a lawyer with a track record of independence who has in the past represented such suits."

In a letter addressed to the Court and filed on November 14, 1973, (D 34), plaintiff stated in part:

*  "The State does not have an adequate law library available to me. This *does not* mean I am entitled to a 'GOVERNMENT AGENCY ATTORNEY', *merely*. I should be able to telephone a number of private attorneys and find someone with a 'track record' of suing government agencies on behalf of a prisoner and winning such suits. In other words I am entitled to *select an attorney* but this cannot be feasible without free and liberal access to telephone calls (a large number) until I contact an attorney of my choice. The attorney should submit to me in advance a retainer bill for his services and the State should pay. This must be the 'penalty' that the State *must* and *should* pay under Gilmore.

"Only in a dictatorship country could I conceive of the shocking occurrences happening to some one as it's obviously happening in my case. Marc Kapustin, with the AID and ABETTING of the law clerk of the district court judge in my action,—has been selecting under the 'AEGIS OF GOOD FAITH OF THE COMMONWEALTH'—'OEO' attorneys to talk to me, and *'free to the State'*—parties such as defender association lawyer Isaac Pepp. The question of such attorneys being qualified or appropriate is a question that *must* be considered *irrelevant or moot*." (emphasis in the original)

By letter dated November 14, 1973 (D 36), plaintiff informed the Court that on that same date Atty. David Wilderman and Mr. Otto Hoffman, a law student (both of Cumberland County Legal Services (D 32), met with him at Camp Hill but that he would not agree to their representation since they have never been associated in a suit against a government instrumentality and since they had declined to intervene when a guard allegedly served him a half portion of food.

In a document filed November 14, 1973 (D 37), plaintiff reiterated his position that he should be able to call an attorney of his choice with a "fee generating case" and that such an attorney should not be associated with a government agency, such as legal aid or a defender association. Finally, upon being informed of the December 6th hearing, plaintiff threatened not to testify and to remain mute unless he were afforded the assistance of counsel of his choice.

In addition to the above, on October 3, 1973, plaintiff, threatened with an immediate transfer to Farview State Mental Hospital for an evaluation, requested Court to contact Atty. David Ferleger of the Mental Patient Civil Liberties Project (D 22). In response, my law clerk called Mr. Ferleger who declined to enter an appearance on behalf of plaintiff. Mr. Ferleger, however, did indicate a desire to file an amicus brief challenging the constitutionality of the Pennsylvania Mental Health Act if that issue was reached by the Court.

A few days before the December 6th hearing, the Court contacted the president of the Dauphin County Bar Association to inquire whether there was some group, agency, or law firm which would offer to represent plaintiff without compensation. As a result of that inquiry, Mrs. Patricia Kemp agreed to meet with plaintiff to determine whether his case would merit the attention of the American Civil Liberties Union. Mrs. Kemp, in fact, conferred with plaintiff for about twenty minutes prior to the hearing and patiently made herself available for consultation by plaintiff throughout the entire proceeding.

At the hearing, the Court asked plaintiff whether he would accept the representation of Mrs. Kemp. After some equivocation,[1] plaintiff rejected the offer on the grounds that the state was not

---

[1] The following exchange between the Court and plaintiff concerning whether plaintiff would accept the professional services of Mrs. Kemp is representative of the course of the entire hearing:

"THE COURT: Mr. Silo, my question to you is will you accept Mrs. Kemp as your appointed counsel?

MR. SILO: That's, that's what I direct my—this is exactly what I directed my statement to. In other words, I said if I would —if I would say that I would accept that I think this would be an indication that I would need an evaluation of my mental faculties.

THE COURT: Why?

MR. SILO: Because, as I said before, the—in fact and in law I have proven that I am entitled to state provided counsel. Does this Court take the position that the state has attempted to provide me counsel and I have arbitrarily declined? Is that the position of the Court? Because if that's the position then I have to rebut that point. But I'm in no position—

THE COURT: Well, I don't want to get sidetracked now, I'll get back to that point in a moment. But we're here for a hearing, and Mrs. Kemp has been asked to appear, and she's very graciously agreed, and my question to you is whether you are agreeble to have Mrs. Kemp serve as your counsel appointed by the Court?

MR. SILO: I spoke to Miss Kemp and I was very much impressed with her sincereness, with her sincerity, with her ability, with her presentation of what she represented, and I have every due respect for her good intentions. And I'm positive that Miss Kemp— in fact, I think Miss Kemp would be an excellent attorney for this case after she was ordered by the state to be paid. If she was ordered by the—if the Court ordered the state to provide her as counsel. In other words I do not resent her as a person, or as an attorney, although in reality I really do not know anything about her background.

But the point is this: I feel that I'm being coerced, or I feel that I am the one that is being sidetracked. The Court does not tell me on what basis the question is being put to me. In other words on what basis, legal, factual, logical—

being compelled to pay for her services. Plaintiff also reaffirmed his previous rejection of the services of Mr. Isaac Pepp, Mr. David Wilderman and Mr. Otto Hoffman. Although plaintiff apparently suffered from the misconception that to accept such services would somehow prejudice his right to pursue his motion, I find and conclude that plaintiff, in spite of the reasons assigned by him, declined the services of attorneys contacted on his behalf because the state had not been placed under a court order to provide and pay for such services. From plaintiff's refusal to testify, from his attitude toward the Court, and from the expression of his legal theory, I am convinced that plaintiff has not pursued his motion as vigorously as he has in order to secure professional assistance, but rather to badger those charged with his care and custody.

Throughout the entire proceeding, plaintiff was unruly, disruptive and contemptuous. His responses to inquiries from the Court were evasive, argumentative, and deliberately equivocal and calculating. At the conclusion of the hearing, the Court addressed plaintiff with the following observation:

"And I think it should be noted for the record that in my mind you are a man of some substantial intelligence [2] and that you deliberately evade questions I pose to you because you don't want to be forced to give an answer on which the Court may be able to make a ruling. At this time I don't think you are interested in an adjudication of the issue, you are interested in extending this case just as long as you can."

I adhere to those observations today and conclude that, under the circumstances of this case, plaintiff is not entitled to the appointment of counsel in the manner requested. Every effort has been made to provide counsel for plaintiff, and since he has no desire to accept representation except upon his conditions, I see no reason why such efforts should continue ad infinitum.

Moreover, I am of the opinion that plaintiff's reliance upon Gilmore v. Lynch, supra, is misplaced. In the first place, the Court in Gilmore was specifically confronted with regulations promulgated by the California Bureau of Corrections which limited the number and titles of law books in state prison libraries. In the second place, the Court in Gilmore did not hold that a prisoner is automatically entitled to either an adequate law library or state-provided counsel. The main thrust of that decision is that the state may not prohibit a prisoner from utilizing whatever means are necessary for obtaining a fair hearing.

In the instant case, plaintiff has in no way been denied access to the courts. While it may be that the library facilities at Camp Hill offer meager fare for a prisoner or counsel substitute, plaintiff has been afforded ample opportunity to avail himself of the services of an attorney. Plaintiff, however, has declined those services solely because the state was not ordered to pay for them. Even if the Commonwealth were held to be under an affirmative duty to provide coun-

THE COURT: Well, you've said you're unable to prepare your own petitions because you are not learned in the law; you're not an attorney. And the Court has gone to great extremes in this case, and my patience is wearing thin, to see to it that your request is honored to the extent that I think is reasonable. And pursuant to that I have requested counsel to appear and represent you. Now, my only question to you is, do you want to accept that Court appointment or don't you?

MR. SILO: I could repeat what I said but I won't repeat it because it's not right. But I will say this. I mean, that's a direct question. And I respectfully state, will I accept Mrs. Kemp as an attorney or will I not. The question is, any person appearing in a Court Room, according to Powell versus Alabama, a 19—Supreme Court decision, 1932, has the right to choose their own counsel in a civil or criminal case. But the question—" Notes of Testimony, at pages 6–8.

2. This conclusion is buttressed by the fact that plaintiff is an accounting graduate of Temple University.

sel for plaintiff, I do not believe it can be compelled to offer those services in the manner which plaintiff demands. See Page v. Sharpe, 487 F.2d 567 (1st Cir. 1973); Brown v. Sielaff, 363 F. Supp. 703 (W.D.Pa.1973); Hampton v. Schauer, 361 F.Supp. 641 (D.Col.1973); Lee v. Stynchombe, 347 F.Supp. 1076 (N.D.Ga.1972); Cruz v. Hauck, 345 F. Supp. 189 (W.D.Tex.1972), rev'd. and remanded, 475 F.2d 475 (5th Cir. 1973); and cf. Noorlander v. Ciccone, 489 F.2d 642 (8th Cir. 1973); White v. Sullivan, 368 F.Supp. 292 (S.D.Ala.1973); Hooks v. Wainwright, 352 F.Supp. 163 (M.D. Fla.1972); Collins v. Schoonfield, 344 F.Supp. 257 (D.Md.1972).

Accordingly, plaintiff's motion to have the Commonwealth of Pennsylvania provide him with counsel will be denied.