**Robert O. GILMORE, Jr., John Van Geldern, et al., Plaintiffs,**

v.

**Thomas C. LYNCH, Attorney General of California, et al., Defendants.**

No. 45878.*

United States District Court,
N. D. California.

May 28, 1970.

106

John Wahl, San Francisco, Cal., for plaintiffs.

George Nock, Deputy Atty. Gen., for defendants.

Marshall W. Krause, American Civil Liberties Union, San Francisco, Cal., amicus curiae on behalf of plaintiffs.

### ORDER GRANTING RELIEF

Before DUNIWAY, Circuit Judge, and ZIRPOLI and WOLLENBERG, District Judges.

PER CURIAM.

Plaintiffs herein are prisoners at various facilities administered by the California Department of Corrections.

They challenge certain rules and regulations of the Department concerning inmate access to law books, legal materials, and lay assistance in preparing prisoner writs and complaints. Also attacked are procedures of the California State Law Library regarding circulation of legal materials to prisoners. Since plaintiffs ask that the enforcement of these rules be enjoined on constitutional grounds, and since the rules are of state-wide applicability, a three judge court was mandated by the Court of Appeals for this Circuit. Gilmore v. Lynch, 400 F. 2d 228 (9 Cir. 1968), cert. den. Lynch v. Gilmore, 393 U.S. 1092, 89 S.Ct. 854, 21 L.Ed.2d 783 (1968); 28 U.S.C. § 2281; Okl. Natural Gas Co. v. Russell, 261 U.S. 290, 43 S.Ct. 353, 67 L.Ed. 659 (1923); Ala. Pub. Service Comm. v. Southern Ry. Co., 341 U.S. 341, 343 (footnote #3), 71 S.Ct. 762, 95 L.Ed. 1002 (1951).

Some of the prison rules originally brought into question by plaintiffs have since been suppressed or amended in response to changed institutional situations and in light of recent court decisions.[1] Others remain, however, and their constitutionality is now before the Court. More specifically, the Court is asked to pass on Prison Regulation 330.-041, which establishes an exclusive list of "basic codes and references" for prison use,[2] and Director's Rule 2602, which, among other provisions, requires that all legal papers remain in the possession of the inmate to whom they pertain.[3] The State Library procedures herein questioned also set up a restricted list of law books available for prison circulation. Evidently, only one copy of each of the listed works is set aside for inmate borrowers, and even a great many of these have been lost or stolen over the years.[4]

1. Most noteworthy among these decisions is Johnson v. Avery, 393 U.S. 483, 89 S. Ct. 747, 21 L.Ed.2d 718 (1969).

 Prisoners who are financially capable of doing so may now purchase law books and other materials for their personal use. Transmittal Letter No. 5/69, dated May 9, 1969, and signed by R. K. Procuner, Director of Corrections. Similarly, more articulate and better educated inmates may assist others in the preparation of legal papers. Director's Rule D2602, as modified.

2. The Department of Corrections Administrative Manual sets forth the text of Regulation 330.041 as follows:
 "There shall be established in each institution a standard set of basic codes and references which shall consist of and be limited to:
 (1) The California Penal Code
 (2) The California Welfare and Institutions Code
 (3) The California Health and Safety Code
 (4) The California Vehicle Code
 (5) The United States and California Constitutions
 (6) A recognized law dictionary (such as Black's)
 (7) Witkin's California Criminal Procedures (Bender Moss Co.)
 (8) Subscription to California Weekly Digest
 (9) California Rules of Court

 (10) Rules of United States Court of Appeals (Ninth Circuit)
 (11) Rules of United States Supreme Court."
 The above regulation is to be read in conjunction with the Director's Transmittal Letter 26/66, which, in discussing the regulation, adds that "all existing law books and references in inmate law libraries not consistent with this section are to be removed and destroyed." By informal stipulation of the parties, this directive of the Transmittal Letter has not been enforced during the pendency of this action.

3. D2602 reads as follows: "One inmate may assist another inmate in the preparation of legal documents, but may not receive remuneration therefor. Remuneration is not limited to present benefits, but includes future as well as past benefits. A room or rooms may be designated by the Warden or Superintendent for this purpose. All briefs, petitions and other legal papers must be and remain in the possession of the inmate to whom they pertain."

4. The sets available from the State Law Library for circulation to prison inmates are the California Appellate Reports (1st and 2d); California Reports (1st and 2d); California Reporter; Pacific Reporter (1st and 2d); Federal Reporter (1st and 2d); Federal Rules Decisions; Federal Supplement; United States Re-

The arguments put forward by each side are simply summarized. Plaintiffs allege that the above rules and regulations, taken individually, are arbitrary and unreasonable, and that taken collectively they deny indigent prisoners, and their jailhouse lawyers, the legal expertise which is necessary if access to the courts by these persons is to be in any way meaningful. Defendants answer with a citation to certain dicta in Hatfield v. Bailleaux, 290 F.2d 632 (9 Cir. 1961), a decision by a three-judge court of this Circuit. While affirming the right of the incarcerated not to be unreasonably hindered in making use of the courts, *Hatfield* added that "[s]tate authorities have no obligation * * * to provide library facilities and an opportunity for their use to enable an inmate to search for legal loopholes in the judgment and sentence under which he is held, or to perform services which only a lawyer is trained to perform". *Id.* at 640.[5] Defendants conclude from this that the provision of law books in prison libraries is a matter of governmental grace, i. e. a privilege to be withheld or conditioned as the State chooses. Alternatively, the Attorney General argues that the regulations here under attack are defensible in light of certain legitimate state interests. He cites the need for "economy and standardization" as justifying the restricted prison book lists. The rule barring retention by jailhouse lawyers of papers pertaining to the affairs of others is justified by the need to deny such "lawyers" the tools by which they might coerce payment for their services. Finally, the procedures of the State Library are said to be aimed at problems of loss and mutilation occasioned by inmate borrowers.

The dual thrust of defendants' argument is an implicit recognition that labelling prison libraries a "privilege" and not a "right" will not forestall judicial inquiry into the conditions upon which the "privilege" is granted or withheld. See the oft-cited article by Van Alstyne, The Demise of the Right-Privilege Distinction in Constitutional Law, 81 Harv.L.R. 1439 (1968). The prisoner is no longer regarded as a temporary "slave of the State" [Ruffin v. Commonwealth, 62 Va. 790 (1871)], and prison officials are not now such masters of their own domain as to be free of the restraints of constitutional reasonability. Coffin v. Reichard, 143 F.2d 443 (6 Cir. 1944); Jackson v. Godwin, 400 F.2d 529 (1968). The Courts have used various linguistic formulae to describe the limits to prison rule-making authority, sometimes speaking of constitutional rights which are so pre-eminent that they cannot be alienated no matter what the needs of penal administration might be, and at other times void-

---

ports; Supreme Court Reporter; U.S. Supreme Court Reports, Lawyers' Edition (1st and 2d): California Codes (pamphlet editions only); and California Statutes and Amendments to the Codes.

The apparent completeness of the above list is illusory in view of the facts alluded to above, i. e. that there is only one copy of each of the above sets available for circulation to all California prisoners (of which there are some 30,000), and that a great many volumes have been lost or stolen and have not been replaced. Ninety-three volumes of the United States Reports, for example, are quite unavailable to any inmate borrower. The borrower's ability to seek out parallel citations in other volumes is hindered, to say the least, by the lack of any lists of parallel citations in either the prisons or on the State Law Library Prison List.

5. Hatfield passed upon the constitutional acceptability of certain Oregon prison regulations which were, for the most part, "time, place and manner" restrictions on access to legal materials, rather than restrictions on the *kinds* of legal materials available to indigents. The regulations in *Hatfield* barred access to law books for prisoners in temporary isolation, and limited the free time which prisoners could spend on legal research. The Court noted that periods of isolation in no case before it exceeded 27 days, and found the other rules reasonable in light of the prisons' interest in barring the practice of jailhouse law. The latter consideration is, of course, no longer cognizable under Johnson v. Avery, *supra* note 1.

ing regulations which confer or withhold "privileges" so arbitrarily as to constitute unequal protection of the laws to certain classes of prisoners. Pierce v. La Vallee, 293 F.2d 233 (2 Cir. 1961); Jackson v. Godwin, *cit. supra*. In most cases, however, the basic test remains the same: the asserted interest of the State in enforcing its rule is balanced against the claimed right of the prisoner and the degree to which it has been infringed by the challenged rule. Most prison regulations reflect the clear exigencies of a penal situation and the courts are justifiably reluctant to question their wisdom. Austin v. Harris, 226 F.Supp. 304 (D.C.1964). Other rules, though, touch upon interests of which the judiciary is more solicitous, and the burden of justifying these regulations is especially heavy, comparable to the "overwhelming state interest" required by Shapiro v. Thompson, 394 U. S. 618, 89 S.Ct. 1322, 22 L.Ed.2d 600 (1969).[6]

■ The rights invoked by plaintiffs herein have been given considerable emphasis by past and present case law. Reasonable access to the courts is a constitutional imperative which has been held to prevail against a variety of state interests.[7] Similarly, the right under the equal protection clause of the indigent and uneducated prisoner to the tools necessary to receive adequate hearing in the courts has received special reenforcement by the federal courts in recent decades. Gideon v. Wainwright, 372 U.S. 335, 83 S.Ct. 792, 9 L.Ed.2d 799 (1963); Douglas v. California, 372 U.S. 353, 83 S.Ct. 814, 9 L.Ed.2d 811 (1963); Griffin v. Illinois, 351 U.S. 12, 76 S.Ct. 585, 100 L.Ed. 891 (1956); Richards v. Townsend, 303 F.Supp. 793 (D.C.1969).

■ Plaintiffs argue, then, that at stake here are two principles of recognized importance, i.e. their rights to reasonable access to the courts, and to equal protection of the laws. But the simple invocation of these phrases will not carry the day for plaintiffs, for they must further show that these rights are not only affected by the regulations under attack, but are infringed to such a degree as to render the justifications offered by the State inadequate and unreasonable as a matter of law. Here, the State alleges that the infringement is minimal, and that its interests are great, and this claim must now be weighed by the Court.

---

6. Thus, the right of a prisoner not to be subjected to racial discrimination is so paramount that it will prevail over even a strong showing that racial segregation of inmates tends to lessen intramural strife and disciplinary problems. Also most closely scrutinized will be charges of religious persecution. Pierce v. La Vallee, and Jackson v. Godwin, *cit. supra*.

Statements of the general rule differ in their tone, but nonetheless make it clear that prison rules must pass the basic test of due process reasonability, with that test being more or less stringent according to the character of the right taken from the prisoner. Thus: "* * * the general rule is that under ordinary circumstances prison authorities have a large discretion as to matters of prison administration and that * * * a federal court [will not] grant relief to a state prisoner complaining against his warden because of the latter's disciplinary orders. * * * But there are exceptional cases, as when a substantive constitutional right is involved." Nolan v.

Scafati, 306 F.Supp. 1 (D.C.1969). Also: "[C]onviction and incarceration deprive [one] only of such liberties as the law has ordained he shall suffer for his transgressions. * * * A prisoner retains all the rights of an ordinary citizen except those expressly, or by necessary implication, taken from him by law. * * * the acts of which appellant complains * * * were not necessary for the proper punishment of an insubordinate inmate to secure his submission and obedience to its reasonable rules and regulations." Coffin v. Reichard, *cit. supra*, 143 F.2d at pp. 444–445.

7. One of the earliest enunciations of the rule was in Ex parte Hull, 312 U.S. 546, 61 S.Ct. 640, 85 L.Ed. 1034 (1941), which, though admitting the legitimacy of official desires to ensure that inmate petitions were "properly drawn", nonetheless voided a prison regulation which required all habeas petitions to be reviewed by prison authorities before being filed.

The basic codes and references authorized for prison use under Prison Regulation 300.041 would offer meager fare to a criminal lawyer. There are no annotated codes, no United States Reports, no federal reports, no California Reports. There are unannotated versions of four of California's codes, but there is no copy of any part of the United States Code. There are copies of the rules of the California and certain federal courts, but there is no edition of the Rules of the Federal District Courts which receive a great many of the habeas corpus petitions, and all of the civil rights petitions, filed by California prisoners. There is one copy of Witkin's treatise on California criminal procedure, but there are no other law books or journals, such as "U.S. Law Week," on the list.

The State answers that the needs of a criminal lawyer are not comparable to those of an inmate, since no legal expertise is required of a prisoner asking for judicial relief. All the convicted felon need do is file a brief statement of the facts of his case. If these facts state a colorable ground for relief, an attorney will be appointed to argue the case. There is no need, it is claimed, for legal arguments or citations in a collateral attack upon a judgment of conviction. See 28 U.S.C. § 2242, and Sokol, Federal Habeas Corpus, pp. 92–94 (1969) (Second Edition).

 The wording of the statute and the wishes of the scholars notwithstanding, this Court takes notice that more than simple "facts" are needed in order to file an adequate petition for relief by way of habeas corpus. A prisoner should know the rules concerning venue, jurisdiction, exhaustion of remedies, and proper parties respondent. He should know *which* facts are legally significant, and merit presentation to the Court, and which are irrelevant or confusing. When the Return is filed, it is never without abundant citations to legal authority, and a proper traverse must take cognizance of these points. No attorney filing a habeas petition omits a statement of points and authorities, and neither does the State's attorney in responding to one. Johnson v. Avery, *supra* note 1, has explicitly recognized the relevance of legal expertise to the filing of petitions in habeas corpus. "For all practical purposes, if [illiterate and poorly educated] prisoners cannot have the assistance of a 'jail-house lawyer', their possibly valid constitutional claims will never be heard in any court." *Id.*, 393 U.S. at 487, 89 S.Ct. at 749, citing the lower court decision at 252 F.Supp. 783, 784 (D.C.1966). The initial burden of persuading a judge that an evidentiary hearing is necessary lies with the prisoner; given the hundreds of petitions with which the courts are flooded, this burden is a heavy one which only "a few old hands or exceptionally gifted prisoners" can carry. *Id.*, 398 U.S. at 488, 89 S.Ct. at 750.

 "Access to the courts," then, is a larger concept than that put forward by the State. It encompasses all the means a defendant or petitioner might require to get a fair hearing from the judiciary on all charges brought against him or grievances alleged by him. In some contexts this has been interpreted to require court-appointed counsel for indigents. Gideon v. Wainwright and Douglas v. California, *cit. supra*. In other situations, the State might be obligated to provide free transcripts, process-serving facilities, and *in forma pauperis* filing privileges. Indigents asking for habeas corpus relief are not invariably entitled to court-appointed counsel [Eskridge v. Rhay, 345 F.2d 778 (9 Cir. 1965)], but Johnson v. Avery, *supra*, note 1, makes it clear that some provision must be made to ensure that prisoners have the assistance necessary to file petitions and complaints which will in fact be fully considered by the courts.

 The alternatives open to the State are legion. It might authorize Public Defenders to help inmates in collateral proceedings. Or it could institute programs whereby law students and professors could aid the indigent con-

vict.[8] The solution thus-far chosen by California is patch-work: the affluent are guaranteed the right to communicate with private counsel [Calif.Pen. Code, § 2600(2)], and to buy personal law books without restriction save as to space limitations.[9] The indigent, however, are relegated to seeking out fellow inmates with legal knowledge, and to the resources of the prison law library, the contents of which are severely limited under the regulation now under attack. The prison libraries are to some extent backed up by the State Law Library. However, that institution has itself composed a restricted list, also under challenge here, which shares the weaknesses of the Department of Corrections list described above in that many works are not on the list, and even the books listed are apt to be missing.

 Thus, while recent reforms have immeasurably aided the more affluent of California's prisoners in securing access to legal advice and the courts, the lot of the indigent inmate has been somewhat neglected. This neglect of one class, when contrasted with the attention paid to the rights of others, raises serious equal protection questions. Further, for the reasons above stated, plaintiffs' very clearly defined right to reasonable access to the courts is seriously infringed by the highly restricted nature of the book list set forth in Prison Regulation 300.041, even if that list is theoretically supplemented by the State Law Library.

The countervailing considerations offered by the State do not provide sufficient justification for the regulation. The Attorney General has cited the need for economy and standardization in the prisons, but such asserted interests were considered and found insufficient in nearly all the indigent rights cases cited above. In truth, the governmental interests advanced by the defendants in those cases seem much stronger than the considerations advanced by the Attorney General here. The admittedly substantial disciplinary problems of newly integrated prisons were held to be no justification for continuing segregation in other prisons. The fact that a religion allegedly preached race hatred did not make right official attempts to bar adherents of that religion from holding chapel services in prison. Jackson v. Godwin, and Pierce v. La Vallee, *cit. supra;* Lee v. Washington, 390 U.S. 333, 88 S.Ct. 994, 19 L.Ed.2d 1212 (1968); Fulwood v. Clemmer, 206 F.Supp. 370 (D.C.1962). Judge Blackmun, when offered similar justifications for the use of the strap in Arkansas prisons answered simply and effectively that "[w]e are not convinced * * * by any suggestion that the State needs this tool for disciplinary purposes and is too poor to provide other accepted means of prisoner regulation. Humane considerations and constitutional requirements are not, in this day, to be measured or limited by dollar considerations or by the thickness of the prisoner's clothing." Jackson v. Bishop, 404 F.2d 571, 580 (8 Cir. 1968).[10] Just as the harshness of Arkansas pris-

---

8. For further suggestions, see Larsen. Spector, and Krause, Prison Writ-Writing: Three Essays. 56 Calif.L.Rev. 342 (1968).

9. See note 1, *supra.*

10. Johnson v. Avery, *supra* note 1 at p. 488, 89 S.Ct. at p. 750, offers another example of a judicial balancing of "indisputable" State interests against clear inmate rights, and a finding that the latter must prevail:

"It is indisputable that prison 'writ-writers' like petitioner are sometimes a menace to prison discipline and that their petitions are often so unskillful as to be a burden on the courts which receive them. But, as this Court held in *Ex parte Hull* [*supra* note 7], in declaring invalid a state prison regulation which required that prisoners' legal pleadings be screened by state officials:

" 'The considerations that prompted [the regulations'] formulation are not without merit, but the state and its officers may not abridge or impair petitioner's right to apply to a federal court for a writ of habeas corpus.' "

on whips was not deemed mitigated by the provision that all prisoners be clothed when punished, neither is the fundamental inadequacy of the restricted book list here relieved by the fact that California authorities have succeeded in "standardizing" the law libraries in all of that State's institutions.

The relief to be fashioned by the Court in the instant case presents some problem. On the one hand, a court of equity is traditionally given great discretion in such matters; on the other, judges have always feared to rush in where correctional officials are presumed more fit to tread. Balancing both these considerations, the Court will enjoin the enforcement of Prison Regulation 330.041, but it will not itself undertake the task of devising another system whereby indigent prisoners are given adequate means of obtaining the legal expertise necessary to obtain judicial consideration of alleged grievances cognizable by the courts. The Department of Corrections will, therefore, decide whether to expand the present list of basic codes and references in the manner suggested by this opinion, or whether to adopt some new method of satisfying the legal needs of its charges.

The court is also asked to enjoin the enforcement restrictions by the State Law Library on prisoner use of its collections. This we will decline to do. Assuming that the Department provides adequately for inmate legal needs, the back-stopping function now performed by the State Library will become superfluous, and the Library's need to cope with the real problems posed by serving a prison population would constitute sufficient justification for the rules which are here attacked.

There remains for this Court's consideration only Director's Rule 2602, which provides that "[O]ne inmate may assist another inmate in the preparation of legal documents, but * * * all briefs, petitions and other legal papers must be and remain in the possession of the inmate to whom they pertain." Plaintiffs allege that this rule prevents meaningful mutual assistance, in that it requires in effect that all writing take place in mess halls, where such is impossible, or in libraries, where access is limited and talking is banned. The Court notes, however, that the rule can be easily interpreted to bar only storage of completed legal papers in the cells of persons to whom they do not pertain. Thus, the "jailhouse lawyer" could compose such documents in his own cell, but once they are completed he must deliver them to the possession of the "client," without any threats to retain them until payment is forthcoming. Assuming such an interpretation of Director's Rule 2602, the Court finds it constitutionally valid.

Accordingly it is hereby ordered that Defendants be and are enjoined from enforcing Prison Regulation 330.041. Defendants are further ordered, on or before September 1, to file with this Court new or amended regulations which accord with the principles expressed herein. If plaintiffs desire oral argument on the adequacy of such new or amended regulations, they will properly move for a hearing thereon. Otherwise, the Court will entertain written briefs concerning the proposed regulations, and will make such further decision as it deems appropriate. In the interim, no law books, codes, or references now in prison libraries will be destroyed or removed because they are not on the basic reference list promulgated by Prison Regulation 300.041.

It is so ordered.